A97A1738. PARKS v. STATE FARM GENERAL INSURANCE COMPANY.
(497 SE2d 575)

Judge Harold R. Banke.

Robert L. Parks sued State Farm General Insurance Company ("State Farm") seeking payment under two insurance binders allegedly issued by State Farm. Parks appeals the trial court's order granting State Farm summary judgment.

Viewed in a light most favorable to Parks, the non-movant, the evidence was as follows. In early February 1993, Parks met with his State Farm agent of fourteen years, Ronald Ray, to renew two State Farm insurance policies which had expired a few months earlier. Parks testified that when he informed Ray that his existing State Farm policies on two rental houses had lapsed and that he wanted to "get some coverage," Ray responded, "Okay." Parks did not recall that Ray told him that State Farm's home office or that someone in State Farm's underwriting department would have to make the decision to bind coverage. Parks testified that if Ray had so informed him he would have remembered that fact.

During their transactions, Parks gave a $500 check for the anticipated premiums to Ray, who retained the check, a fact admitted by State Farm. Although Ray did not provide a copy of the paperwork at issue to Parks, the application stated that "coverage is not provided until this application is approved by State Farm's Underwriting

Department."[1] According to Parks, this disclaimer language did not concern him because he had previously obtained insurance notwithstanding the same language. At the time Parks met with Ray, Parks had existing auto insurance and fire insurance with State Farm. Parks testified that when he left his agent's office, he did so with the understanding that he had a binder for temporary insurance on both properties and that State Farm would subsequently issue written policies to him as it had done on previous occasions.

About ten days later, Ray appeared at Parks' place of business and told Parks that he was returning his check and that State Farm "wouldn't be able to write it." Parks became angry because he felt that State Farm had suddenly left him stranded with no insurance. Almost immediately after Ray contacted him, believing that State Farm had left him stranded with no protection for his property, Parks sought and obtained coverage from Southern General Insurance Company ("Southern General"). About six days later, on February 21, 1993, a tornado virtually demolished both rental houses.

On March 6, about a month after Parks had applied for insurance, State Farm notified him in writing that it had decided to reject his applications for policies. In each of two letters, State Farm stated, "After careful review, we regret that we are unable to issue a policy as requested. The coverage provided under this application and binder is cancelled effective April 8, 1993. We are not able to issue a policy as requested due to not meeting underwriting requirements. For your continued protection, we urge you to secure other insurance to prevent any lapse in coverage."

State Farm's underwriter, Ruby Aldridge, testified that she made the decision to decline the requested coverage based on previous claims and losses and Parks' inconsistent payment history. According to Aldridge, she contacted Ray so that he could notify Parks of State Farm's decision. Aldridge claimed that State Farm sent these two letters to Parks by mistake. The rejection letters from State Farm clearly indicate that State Farm had agreed to provide temporary coverage and would continue to do so until April 8, well after the date of loss.

Ray disputed Parks' version of events. Ray testified that when Parks came to him "seeking to put insurance coverage back on the two properties," he informed Parks that the underwriting department would have to provide approval before any coverage would be provided. According to Ray, he returned Parks' premium check before

---

[1] Each Rental Dwelling Binder Receipt stated that this "[b]inder is not valid unless signed by a State Farm Agent," and neither contains a signature in the designated block.

State Farm made its underwriting decision to decline Parks' applications.

Under its insurance policy with Parks, Southern General paid Parks for the losses to both houses. Southern General then unsuccessfully sought reimbursement from State Farm as Parks' subrogee. Southern General sued State Farm in the name of its insured, Parks, alleging that State Farm breached its contract to provide Parks with typical short-term binder coverage pending approval of the policies. The trial court determined that there was no meeting of the minds as to the creation of any binder prior to the time of the loss. Finding that Parks failed to prove that a contract had been formed, the trial court granted State Farm's motion for summary judgment. *Held*:

In his sole enumeration of error, Parks contends that the trial court erred in ruling that State Farm did not issue a binder for insurance. We agree. Although the dissent declares that "there never was a binder," that conclusion is unjustifiable given the disputed factual evidence showing the creation of a binder.

A binder is a contract for temporary insurance protection, the creation of which requires language or conduct sufficient to show that there has been a meeting of the minds. *Peterson v. Liberty Mut. Ins. Co.*, 188 Ga. App. 420, 423 (373 SE2d 515) (1988). A binder can be oral or written. OCGA § 33-24-33; *Thomas v. Union Fidelity Life Ins. Co.,* 168 Ga. App. 267, 268 (1) (308 SE2d 609) (1983). A binder is not a mere offer but is itself " ' "a contract — temporary, sketchy, and informal. . . ." ' [Cit.]" *Cincinnati Ins. Co. v. Stuart*, 139 Ga. App. 80, 82 (1) (227 SE2d 771) (1976). A binder affords temporary protection pending the investigation of risk by an insurer or until the issuance of a formal policy. Id.

The language or conduct necessary to create an insurance binder is fact-specific. It is simply that which is enough to show that there has been a meeting of the minds, such as "you're covered," or a receipt for premiums or an extensive course of similar prior insurance transactions between the parties. *Ray v. Ga. Farm &c. Ins. Co.*, 176 Ga. App. 776, 778 (337 SE2d 779) (1985); see Jenkins & Miller, Ga. Auto. Ins. Law Including Tort Law (1994 ed.), § 1-1. A receipt for premiums may in certain circumstances constitute a binder, provided that the surrounding circumstances would lead a reasonable person to conclude that such was the parties' intention. *Greene v. Commercial Union Ins. Co.*, 136 Ga. App. 346, 347 (1) (221 SE2d 479) (1975). Compare *Peterson*, 188 Ga. App. at 421. See Keeton & Widiss, Insurance Law, A Guide to Fundamental Principles, Legal Doctrines & Commercial Practices, 1988, p. 72, § 2.4 (a) ("An application for insurance is an offer which is regarded as having been accepted (that is, acceptance is inferred or implied) when an insurer remains silent after receiving the application, especially when such silence is accom-

panied by the retention of a premium payment.").

Ray's conduct, including his acceptance of the premium check, coupled with the parties' past course of dealings, was sufficient evidence to foreclose summary judgment as to whether a binder for temporary protection had been created. State Farm's correspondence, which stated "[f]or your continued protection, we urge you to secure other insurance to prevent any lapse in coverage [after April 8]," and State Farm's admission that its agent retained a "check as a down payment" buttress Parks' evidence that he had temporary protection for his property until State Farm provided legally sufficient notice of its cancellation. Therefore, a jury must resolve the facts in dispute to determine whether a binder was, in fact, created.

The dissent miscasts the entire controversy by commingling facts relating to the creation of a binder and facts regarding the issuance of a policy. No one claims that State Farm ultimately decided to issue a policy. In dispute is whether Parks obtained temporary protection from State Farm until April 8, coverage which the record fails to show that State Farm effectively cancelled in compliance with state law which requires that an insurer provide ten days' written notice before cancellation. OCGA § 33-24-44 (d). Compare *Goodley v. Fireman's Fund &c. Ins. Co.*, 173 Ga. App. 277, 278 (1) (326 SE2d 7) (1985) (statutory notice requirement inapplicable where policy expired or lapsed due to policyholder's failure to pay premiums). OCGA § 33-24-44.

Although it is true that Parks stated that he did not believe that he had coverage after Ray returned his check, neither Ray's unilateral act of orally attempting to cancel the binder contract nor Parks' belief, if mistaken, would have dissolved the binder if it had been in existence. OCGA § 13-2-4. See *McDuffie v. Criterion Cas. Co.*, 214 Ga. App. 818, 821 (449 SE2d 133) (1994). As the dissent correctly notes, several days after the business had been transacted in Ray's office, Ray returned the premium check to Parks and told him that State Farm would not provide coverage. State Farm failed to offer any explanation as to why Ray would suddenly feel compelled to seek out Parks to inform him that State Farm would not be able to issue a binder to him, unless Ray had earlier told Parks otherwise.

The record belies the dissent's assertions that there is "not even a shadowy semblance" of acceptance and that "there is no evidence whatsoever that a binder with State Farm existed at the time of the loss." Parks had a longstanding course of obtaining State Farm insurance through dealing with Ray as his agent for 14 years. According to Parks' testimony, he went to his State Farm agent, applied for coverage, presented a premium check, and left with the understanding that his property was insured. Parks' claim that he had obtained short-term binder protection is supported by the correspondence

from State Farm which stated this temporary coverage would cease on April 8, approximately two months after Parks applied for binder protection, and well after the date of loss. As discussed above, under our law, a binder for temporary protection can be created with significantly less formality than a typical contract. Critical evidence remains in dispute as to what actually transpired between Parks and Ray during the application process. Whether there was a meeting of the minds sufficient to give rise to a binder is a jury question. In light of the disputed evidence as to whether Ray's alleged conduct and the attendant circumstances would have led a reasonable person to conclude that a short-term binder had been created, it cannot be said that State Farm was entitled to summary judgment as a matter of law. *Greene*, 136 Ga. App. at 349 (1).

*Judgment reversed. McMurray, P. J., Ruffin and Eldridge, JJ., concur. Andrews, C. J., Birdsong, P. J., and Beasley, J., dissent.*

BEASLEY, Judge, dissenting.

I respectfully dissent because the trial court was correct. I would adopt its order explaining the reasons for the grant of summary judgment to State Farm and the denial of summary judgment to plaintiff Parks. Considering the undisputed facts, there is an absence of evidence to support at least one essential element of the nonmoving party's case, the test for summary judgment articulated in *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

There never was a binder, and the mistake in the letters (there were two identical letters, one for each property) did not inadvertently create a binder nunc pro tunc to cover the property damage that occurred after Parks' check for premiums had been returned to him and he had been told State Farm would not provide coverage.

Parks, an experienced businessman, realized one day that the insurance on two of his four rental properties had lapsed for nonpayment of premiums several months earlier. He went to insurance agent Ray and provided the required information for the agent to complete application forms for new insurance with State Farm, which had previously provided coverage, and he signed the applications.

He understood the provision on the forms which stated: "I understand that coverage is not provided until this application is approved by State Farm's underwriting department." In fact, a handwritten "x" is marked in the box "not provided . . ." as opposed to the box "provided by this application," right above his signature confirming that all the statements in the "application" are true. He also read and signed for each property a "Rental Dwelling Binder Receipt" that was not signed by an agent and that stated: "This Binder is not valid unless signed by a State Farm agent." The receipts contained in addi-

tion the same statement acknowledging there would be no coverage until the underwriting department approved.

Parks left a check at Ray's office even though Ray did not request any money at that time. The check was for $500, an amount Parks wrote although the proposed base premiums subject to revision were shown on the applications to be $206 and $198. He testified that when he left, he "assumed" he had coverage because, on earlier occasions, agents just phoned and got approval for a binder from other insurers. He did not see Ray do so on this occasion, and he did not testify that Ray told him he had coverage or a binder. In response to a question, he testified only that he did not recall Ray telling him that the policies would have to be approved by the underwriting department and thought he would have remembered if he did. He was aware that he was in difficulty with State Farm, as it had cancelled his insurance before. Ray testified in affidavit that he "informed Mr. Parks that the underwriting department would have to provide approval before any coverage could be provided."

State Farm's underwriting department did not approve the application. State Farm did not "admit that Ray retained the check" but merely that Parks submitted an application "together with a check." Ray returned the unnegotiated check to him at his place of business. Ray told him that State Farm "wouldn't be able to write" a policy. Parks understood that he did not have coverage, so he called another agent, who promised to get a binder with another company the next day, which he did. That insurance, with third-party defendant Southern General Insurance Company, covered the two properties at the time of the subsequent tornado damage, and Parks was paid $31,000 for one and $32,000 for the other. The "current market value" of the two properties was shown on the State Farm applications as $34,000 and $32,000, respectively.[2]

Several weeks after payment by Southern General, Parks received from State Farm two identical letters, one on each rental property. They each contained two errors. One was the sentence "For your continued protection, we urge you to secure other insurance to prevent any lapse in coverage." Parks knew his previous policies had lapsed before he went to Ray to apply for new insurance, so he did not have continuous coverage on the properties. The second was the sentence "The coverage provided under this application and binder is

---

[2] The case was originally filed in state court, then removed to federal court, but remanded back to state court on plaintiff's motion for the stated reason that the amount in controversy did not exceed $50,000. In the amended complaint, Parks seeks from State Farm "an amount to be determined by interpretation and reconciliation of the 'other insurance' provisions" of the Southern General and State Farm policies. It is not clear what "policy" of State Farm is meant, as none was issued. State Farm filed a third-party claim against Southern General, apparently for an amount less than $50,000.

cancelled effective April 08, 1993." Parks knew he had no binder; he had signed two documents making that clear, and Ray had told him he had no coverage when he returned his check.

Parks was surprised when he received the letters, because he did not believe he had coverage with State Farm. If he had thought so, he said, he would have made the Southern General policy commence on the date the State Farm coverage ended. He took the letters to the Southern General agent and never filed a proof of loss claim with State Farm. Instead, thereafter he signed two purported loan receipts for Southern General, and this suit was filed two and one-half years later.

Parks, who is knowledgeable about the value of real property, testified that he does not seek any more than what Southern General already paid him, which was the policy limit on one house and the negotiated sum of $31,000 on the other house. The suit is in actuality between two insurance companies, one which never wrote policies on the property after earlier ones lapsed and one which did.

There is no evidence whatsoever that a binder with State Farm existed at the time of the loss. Parks knew there was none, knew his application had been rejected, and had taken steps to obtain and did obtain other insurance. As recognized by the trial court, a binder is a contract for temporary insurance, which requires a meeting of the minds. OCGA § 33-24-33 (a); *McDuffie v. Criterion Cas. Co.*, 214 Ga. App. 818, 819-820 (449 SE2d 133) (1994); *Peterson v. Liberty Mut. Ins. Co.*, 188 Ga. App. 420, 423 (373 SE2d 515) (1988). Here the meeting of the minds when the tornado struck is exhibited by the application and receipt documents, the return of the check, the accepted statement that there was no coverage, and the acquisition of other coverage. Both Parks and State Farm understood that there was no binder or other expression of coverage by State Farm at that time. There had been only an application, an offer to purchase insurance which was rejected by the insurance company.

Parks' assumption when he left Ray's office the day he made the application cannot surmount the documents he signed clearly stating otherwise. OCGA § 24-6-1 provides: "[p]arol contemporaneous evidence is generally inadmissible to contradict or vary the terms of a valid written instrument." Even in contracts, OCGA § 13-2-4 provides: "The intention of the parties may differ among themselves. In such case, the meaning placed on the contract by one party and known to be thus understood by the other party at the time shall be held as the true meaning." A contract cannot be created by one party's unilateral assumption which directly contravenes what is written and signed in an application. Parks was bound to what he signed. *Malin v. Servisco*, 172 Ga. App. 418 (1) (323 SE2d 278) (1984).

The tendering of a check which Parks intended to cover premi-

ums made no difference. " '[A]n application for insurance, even with the concurrent prepayment of premiums, creates no binding contract of insurance until the insurer manifests its acceptance.' " (Citations omitted.) *Karp v. Western Life Ins. Co.*, 182 Ga. App. 693, 694 (356 SE2d 893) (1987). There was not a single manifestation of acceptance, not even a shadowy semblance. Just as in *Karp* and *Peterson*, there was no meeting of the minds creating a binder at the time the application was made, much less at the pivotal time, liability-wise, which is the time of the loss, which occurred after the check had been returned and Parks was informed the company refused to approve the application. Parks, when deposed, testified that he never paid any money to State Farm for these policies after his check was returned and that he never received a written policy from State Farm in this connection.

As the trial court ruled with respect to the later-received letters, a jury could draw only the conclusion that the statement in the letters targeted by Parks after the fact was a mistake, as the underwriter testified without contradiction. It was the type of letter sent when there is a binding application, which the documents show did not exist. And never did Parks rely to his detriment on any communication or any action or any inaction by State Farm or its agent with respect to coverage.

Summary judgment to State Farm was proper.

I am authorized to state that Chief Judge Andrews and Presiding Judge Birdsong join in this dissent.

DECIDED FEBRUARY 11, 1998 —
RECONSIDERATION DENIED MARCH 10, 1998.

*Jenkins & Nelson, Frank E. Jenkins III, Peter R. Olson*, for appellant.

*Magruder & Sumner, J. Clinton Sumner, Jr., Clay M. White*, for appellee.

